IN THE UNITED STATES DISTRICT COURT
U.S. NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


BENJAMIN WASHINGTON, DC#129138,

      Plaintiff,

-vs-              CASE NO.:3:12-cv-38

KYLE HALL, et al.,

      Defendants.

_____/


### DEPOSITION OF BENJAMIN WASHINGTON


Reported by Elaine Richbourg, a Court Reporter
and Notary Public, State of Florida at Large, in the
offices of Santa Rosa Correctional Institution, 5850
East Milton Road, Milton, Florida, on Thursday,
April 9th, 2015, commencing at approximately 10:00
A.M. CST.


# *ELAINE RICHBOURG*

**COURT REPORTER**
**2320 Brightview Place**
**Cantonment, Florida 32533**
**(850) 968-6465**
**elainerichbourg@cox.net**



1                         **APPEARANCES**

2    For the Plaintiff:

3                         BENJAMIN WASHINGTON, PRO SE
                          Santa Rosa Correctional
4                           Institution
                          5850 East Milton Road
5                         Milton, FL  32583

6

7    For the Defendants:

8                         ERIC NEIBERGER, ESQUIRE
                          Office of the Attorney General
9                         The Capitol, PL-01
                          Tallahassee, FL  32399-1050

10

11

12   COURT REPORTER:
                ELAINE RICHBOURG
13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>INDEX OF TRANSCRIPT</u>

2   WITNESS:

3       BENJAMIN WASHINGTON

4           Direct Examination by Mr. Neiberger.......04

5   Certificate of Oath...........................43

6   Reporter's Deposition Certificate................44

7

8                       STIPULATION

9

10      It is stipulated and agreed by Counsel for the

11      parties that the deposition is taken for the

12      purpose of discovery and/or evidence; that all

13      objections save as to the form of the question

14      are reserved to the time of trial; and that the

15      reading and signing of the deposition are

16      waived, together with notice of the original

17      hereof.

18                  *  *  *  *  *  *  *

19

20

21

22

23

24

25

1    Whereupon,

2                    BENJAMIN WASHINGTON,

3    having been first duly sworn to tell the truth, the

4    whole truth and nothing but the truth, testified as

5    follows:

6                    **DIRECT EXAMINATION**

7    BY MR. NEIBERGER:

8         Q    Good morning, Mr. Washington.  My name is

9    Eric Neiberger.  With me here is Sean Gellis.  We're

10   with the Office the Attorney General.  Do you see my

11   badge?

12        A    Yes, sir.

13        Q    We are here pursuant to a notice of

14   deposition in the case of *Washington v. Hall*, case

15   number 13:12-cv-38.  Do you remember this lawsuit?

16        A    No, no, sir.  What lawsuit are you talking

17   about?

18        Q    You filed a lawsuit against Kyle Hall; do

19   you remember that?

20        A    No, sir, I don't remember no Kyle Hall.

21        Q    You don't know Kyle Hall?

22        A    No.  No, sir.

23        Q    Do you remember filing a lawsuit?

24        A    Yes, sir.

25        Q    Do you remember who you filed a lawsuit

1   against?

2        A    I filed a lawsuit because I was supposed

3   to be free from prison and I got my case overturned

4   and I never got free from prison.  And the hospital

5   had got my papers and stuff like that.  And then I

6   was -- I got my teeth knocked out and stuff like

7   that, but that was because I caused that incident

8   myself.

9             So, what I was filing is because

10  inside the institution that I got my teeth knocked

11  out and stuff, one automatic was going to give me

12  certain things because I got my teeth knocked out.

13  Also, that I got my case overturned.  They found out

14  that I didn't kill Chad Henderson at the time.

15       Q    Okay.  So, we're here today in this

16  lawsuit that I believe you have filed.

17       A    Uh-huh.

18       Q    Let me ask, and we need to get to some of

19  the preliminary stuff.  Have you had any prior

20  depositions before?  Have you ever been deposed

21  before?

22       A    Huh?

23       Q    Can you understand the questions that I'm

24  asking you?

25       A    Yes, sir.

1      Q    Okay.  Have you ever been deposed, like

2  has an attorney ever come to you and been with a

3  stenographer and a camera and asked you questions

4  before?

5      A    Yes, sir.

6      Q    So you have been deposed before?  That's

7  my question:  Have you been deposed before?

8      A    Yes, sir.

9      Q    Okay.  Can I ask in what other cases you

10  were deposed?

11      A    Yes, sir.

12      Q    What cases were you deposed in?

13      A    Well, I was at -- it started off at -- as

14  a juvenile, I was most supposed to go in and help

15  some people in a computer that it was like -- it was

16  supposed to be not an institution, but it was

17  supposed to be a program that I had slapped a little

18  boy in the face, but that was to get inside the

19  institution at Boy's Village.

20      Q    Have you been -- go ahead.  I'm sorry.

21  Continue.

22      A    That was to get inside the institution.

23  The little boy threw dirt in my face.  He was

24  supposed to throw dirt in my face and I was supposed

25  to go to the institution and help his mom and stuff

1    like that.  And when I was supposed to do that, the

2    system got cut out.  The electric got cut out and

3    stuff like that, not just the electric but history

4    got cut out because someone unplugged the vending

5    machine.  Well, through us praying and stuff and

6    doing certain stuff, all of us like marching and

7    stuff, and we even got in the fights at first

8    because we kept losing our memories and stuff at

9    Boy's Village.

10        Q    So.  So you were deposed over that

11   incident?

12        A    Deposed --

13        Q    Like someone came and asked you a bunch of

14   questions in a legal proceeding?

15        A    No one drew me toward an attention to like

16   qualify me to state a statement.

17        Q    Okay.  So, it sounds like you've never

18   deposed before.  That's all I'm trying to ask you;

19   is that correct?

20        A    Well, I've been qualified to run

21   businesses, like to be president of China.  I've

22   been qualified to be -- it's just like --

23        Q    But no one has come and asked you

24   questions, like have you seen another guy in a suit

25   with a badge and another court reporter where we're

1   transcribing everything that has been said before?

2   No one has done that with you before?  It's not an

3   answer that you can give me that's right or wrong

4   really, have you been in this situation before?

5       A    I've been -- I ain't going to say --

6       Q    It's really a yes or no question.

7       A    No, sir.

8       Q    Okay.  And that's fine.  That's all we

9   need to know is whether or not you know ground rules

10  for depositions.

11                  Can I ask:  Are you on any

12  medications?

13      A    I supposed to be prescribed medications

14  since I was born.  I was born on medication, like

15  drugs and stuff like that.

16      Q    Let me rephrase the question:  Are you

17  taking any medication today?

18      A    No, I'm not taking no medication today.

19      Q    Okay.  Do you have any current

20  prescriptions for medications that you take once a

21  week?

22      A    Well, the hospital is in Tallahassee,

23  North Carolina is in Bell Haven, but it's located in

24  Montgomery, Florida.  And it's call the State

25  Hospital of Montgomery, Tallahassee through the law

1    force of the government of parole.  And I signed

2    papers there, which they have my release papers

3    but --

4         Q    Did they give you any medication?

5         A    Yes, they did.

6         Q    Are you taking any of that medication

7    today or within the last, say, within the last seven

8    days?

9         A    I haven't tooken none of that medication,

10   but I have visualized and put immunity in my stomach

11   and, also, done cook medication.

12        Q    No, I think I understand what you're

13   saying.  I know you've probably, everybody has taken

14   medication in the past, you know, at some point.  I

15   mean, I haven't taken any today, but I'm sure, I

16   think, within the last sixty days I've taken some

17   kind of Ibuprofen or something.  So, that's fine.

18   It sounds like what you're telling me is you're not

19   taking any medication today or in the very recent

20   future, or in the very recent past; is that correct?

21        A    Ummm --

22        Q    It's just a simple yes or no question,

23   sir.  I'm not trying to trick you, by any means.

24   All I want to know is what you've seen or what

25   you've done in regards to medication in the last

1    seven days?

2         A    I got a -- I took medication at 10:00, but

3    not at 10:00, but at 9:00 but at 8:00.

4         Q    Today?

5         A    No, at 10:00 on a Monday.

6         Q    Okay.  Do you remember the name of that

7    medication?

8         A    Sympathy.

9         Q    Sympathy?

10        A    Yeah.  It was located in Jerusalem.

11        Q    Did you put a pill, like a little object

12   in your mouth?

13        A    I put a utensil in my leg in a quarter

14   dysm apart professional --

15             COURT REPORTER:  In a quarter what?

16             THE WITNESS:  Quarter dysm.

17             COURT REPORTER:  Dysm?

18        A    (By the Witness)  Yeah, it's like a vile.

19   It's like programmed to -- the code -- see, I want

20   to pronounce it right.  It's spelled

21   C-C-L-L-E-V-V-V-T-T-E-L-E-V-A-L consequence.  That

22   will be spelled W-L-W.com c.com l.com venom.

23             COURT REPORTER:  L.com what?

24        A    (By the Witness)  Venom, like in the

25   cartoons, but not cartoons, but Marvel, but not

1   Marvel but USA, but not USA, but station government

2   news.

3         Q    (By Mr. Neiberger) Do you know where you

4   are, Mr. Washington?

5         A    Um --

6         Q    Where are we today?

7         A    In sysnes quarterdale.

8              COURT REPORTER:   In where?

9         A    (By the Witness)  Sysnes quarterdale,

10   above the box.  It's spelled T-O welcome.

11        Q    (By Mr. Neiberger) What -- do you know --

12   what state are we in?

13        A    We in state quarterdale Nevada.

14        Q    Did you say Nevada?

15        A    Nevada.  It's spelled quality genuine, the

16   Q is silent and the E and special ed vile.  I've got

17   to spell that because I don't have a capital in

18   English.  So it's spelled E-T-T-T-T-T-T

19   consequences.  And I can't pronounce that, so it's

20   spelled in English, and it's spelled like etnickla

21   (phonetic) la slur vouchers.  It's

22   T-T-V-V-V-V-V-V-V-L-R-E.

23        Q    If I told you we were in the State of

24   Florida, would you agree or disagree with me?

25        A    I would disagree because it's Montgomery.

1      Q    Did you just say that the State we are in

2    is Montgomery?

3      A    Uh-huh.

4      Q    Didn't you just tell me, like two minutes

5    ago, that the State we were in was Nevada.

6      A    No, I said quarterdale, where we was in,

7    was a summary of jeshua.  It's called, we're born in

8    the system, okay.  The system is a womb of a

9    mother's womb, but the mother's womb is not a mother

10   womb, it's like earth.  But then it's like a tube.

11   All together it's like a computer system, but it's

12   like we're born on earth.  And in earth there's --

13   it can't be complete unless the babies are born

14   first.  So the youngest babies had to be born first.

15   I would like to have my mom speak on that, do you

16   know what I'm saying, whenever we reach that time

17   frame of matter because all my moms have to be

18   present and they have to be present inside of a

19   kingdom where they lie.  So I can't pronounce that

20   and finish that because not only they have to be

21   there, but all our children and all of them have to

22   speak and it will be when one can reach the

23   president of office and one can see that all the

24   family is there and all the relatives is completed.

25     Q    Do you understand that you are an inmate

1   incarcerated in the Florida Department of

2   Corrections?

3        A    I'm not going to call this the corrections

4   because it was never the Florida State Corrections.

5   This was always a facility where one have come to

6   recuperate to come home.  It's like when you're done

7   on a certain level, you vouch to go to a different

8   home, but it's no one tells you -- it's no such

9   thing as prison or slavery in the United States of

10  America.  United States of America is China and

11  Russia.  That's all.  That's the United States of

12  America.  Anything else is not part of America, it's

13  outside of the quarterdale of another womb.

14       Q    Well, what is a quarterdale?  I've heard

15  that term many times I've heard you say it.  What is

16  a quarterdale?

17       A    A quarterdale is a vibe, it's like it's

18  English, but it's Spanish, but it's Europe, as Pee

19  Wee Herman.

20            COURT REPORTER:  As Pee Wee Herman?

21       A    (By the Witness)  Yeah, Pee Wee Herman,

22  like the movie one have seen, it's Pee Wee Herman.

23       Q    (By Mr. Neiberger) Do you understand that

24  this is a legal proceeding in which you are

25  obligated to tell the truth, to the best of your

1    ability?

2        A    The only time I'm qualified to tell the

3    truth is in front of a marshal.  What I mean by that

4    is during death or -- because that's the only time

5    truth really comes out because when you realize that

6    you -- you're civilized with your community, you're

7    going to find out there is no really such thing as

8    just truth, unless you ask someone that's in that

9    qualified unit.  So everybody have their own

10   statement, but my statement is going to be

11   different, but I'm not going to jeopardize no one to

12   state their consequences and their truth, do you

13   know what I'm saying?

14       Q    I'm going to hand you what's been marked

15   document -- actually, it's not been marked.  I'm

16   going to hand you document 23 filed on January 2nd,

17   2013, and I want you to just tell me if you

18   recognize it?

19       A    Okay.

20       Q    Is this your name right here?

21       A    No, sir.  That's not my name.  That's the

22   person I'm trying to sue inside my family that's

23   gave me right here in the law 42 US.S instead of .C.

24   square 11983.

25       Q    Hold on.  Is your name Benjamin

1  Washington?

2     A   No, sir.  My name is Benjamin Lee

3  Washington.

4     Q   Did I mispronounce your name just then?

5     A   No.  My name is not Benjamin Washington.

6  That's Chad Henderson's name.

7     Q   Who's Chad Henderson?

8     A   The one that we have -- he's my family

9  member.  We have organized -- we have organized a

10  plan to capture the one that's trying to manipulate

11  conscious.

12     Q   Okay.  Let me ask the question again:  Is

13  your name Benjamin Washington DC#129138?

14     A   No, my birthday is 1/29 Benjamin

15  Washington.  Chad Henderson is my twin brother,

16  which my color changed, which makes me verse, which

17  is a V-S.Benjamin Washington inmate, Chad Benjamin

18  Washington 1291 May 3/8, plaintiff vs. Joyce. is his

19  mother, Elizabeth his aunt, Jarking, uncle right

20  here, motel, my dad Norris officer T. Hall is a

21  victim of the zip code that the judge and me have

22  planned once they have obliverized a conscious.

23  Meaning I can't state that on camera, I'm going to

24  have to ask you to turn it off, but I can turn it

25  off.  It's not a power but it's a qualified union.

1    I will have to get my mom from the highest to the

2    lowest from the heavens and all them has my moms and

3    to the dads until we get to them in they place to

4    state that comment if they, which one is right here.

5    And I still can't qualify to show it on TV but I'm

6    not allowed to see inside Ventiment.  I'm the one --

7            COURT REPORTER:  You're not allowed to see

8        inside what?

9            THE WITNESS:  Ventiment.

10           COURT REPORTER:  Ventiment?

11           THE WITNESS:  Ventiment, V-I-N-C-I-N-C-E,

12       Vinci -- S-I-I-M-E-N-D-M-E-N-T.

13       Q    (By Mr. Neiberger) Mr. Washington, can I

14   call you Mr. Washington?

15       A    You're my brother, you can call me that.

16   See how he just changed faces, but your apple is not

17   validatory.

18       Q    Okay.  I've had some real problems

19   following what you're saying, but you're okay with

20   me calling you Mr. Washington?  That's your last

21   name.  I'm trying to just say your last name,

22   Mr. Washington?

23       A    You can call -- I wouldn't say you can

24   call me Mr. Washington because if you call me

25   Mr. Washington, that's like putting me over you

1    because I'm an inmate.  And if you call me

2    Mr. Washington, that means that I'm trying to be

3    smart and that's going to keep me in the institution

4    because --

5        Q    Okay.

6        A    -- inside the institution you can't say --

7        Q    I understand what you're saying.  It's

8    kind of my preference.  I'll call you Inmate

9    Washington, is that okay?

10       A    Well, that's still going to keep -- ICT

11   say if somebody call you Inmate Washington, you're

12   not supposed to say that, because if you say Inmate

13   Washington that's giving false information that

14   ain't allowed to be outside in the community with

15   the community people and you're not ready to go

16   home.  And you can't get a porno.

17       Q    Okay.

18            COURT REPORTER:  You can't get a what?

19            THE WITNESS:  A porno.

20            COURT REPORTER:  Porno?

21       A    (By the Witness)  Yeah.  That mean, a

22   porno means you can't get conjugal visits.  Conjugal

23   visits mean you can't get medication from CVS.

24       Q    (By Mr. Neiberger) Let me do this,

25   Mr. Washington:  Do you know how to write?

1       A     The warden told me you can't say that

2    leave -- you can't say that, the warden here, it was

3    Christopher dash R. stadium was saying you can't use

4    that inside a misdemeanor, that you got to use that

5    inside --

6       Q     Okay.  Let me ask -- listen to my full

7    question.  Do you know how to take a writing

8    instrument, like a pen or a pencil and a piece of

9    paper and put words on that piece of paper; do you

10   know how to write?  Did you understand the question

11   I'm asking you, yes or no?

12      A     No, sir.

13      Q     Okay.  Let me turn to page -- document 23,

14   page 5.  Do you recognize document 23, page 5?  It's

15   page 5 of your second amended complaint?  Yeah, page

16   5.  Do you recognize the writing on page 5 of

17   document 23?

18      A     No, sir.  This is not my -- this is not my

19   deposition.  This is not my document.  I have

20   document 45.  It's located on page 5 of 10.  This is

21   Officer K. Hall document falsely accusing me of

22   these things inside the hospital.  He's never been

23   inside the hospital.

24      Q     Okay.  Let me just stop you, okay.  Can

25   you read from the first line, from the left to the

1   right and just tell me what it says?

2       A    Fax --

3       Q    No, right here.  Just let me, I'll -- I

4   don't have highlight with me.  Just right here

5   between these two dash marks, document 23, page 5 --

6   oh, thank you.

7            Just read that highlighted portion

8   that I just underlined right there.  Can you read

9   that to me?

10      A    I don't understand that.

11      Q    All I need you to do is tell me what this

12  says, that first line.  I'm not trying to trick you.

13      A    Can I say what that line mean --

14      Q    Correct.

15      A    Okay.  That line mean consequences to me.

16  That line right there, and by that line just popping

17  up, it means data base.  That means like you stuck

18  in prison forever no matter what because one going

19  to keep touching you.

20      Q    Okay.  I want you to tell me if you agree

21  with me.  I'm going to read this line, just the very

22  first line, and I want you to tell me if that's what

23  this piece of paper says.

24           On April 27, 2011, the plaintiff was

25  housed in D dormitory at Santa.  Is that language

1    contained on this sheet of paper?

2         A    Oh, what I see now --

3         Q    Okay.  Now, can you read just this top

4    line to me?

5         A    Must be addressed in a separate civil

6    rights complaint.  This is saying --

7         Q    Under that.  Okay.  Good, so you can read?

8         A    Uh-huh.

9         Q    What does the line right under that say?

10        A    Rosa Corrections.  That means on April --

11        Q    Right here.

12        A    Okay.  That means -- I can't -- I can't --

13   I can't, I can't state what that means because it

14   say must be addressed in a separate civil rights

15   complaint right there.  So I can't -- I can't say it

16   now.

17        Q    Okay.  So good.  So you do know how to

18   read?

19        A    Yes.

20        Q    So you must know how to read because you

21   went and stated the line above it.

22        A    But you -- well, it say faxed in claims of

23   case, so UN/A document 23, because that's what I

24   see.  You asked me what I see.  So that's what I

25   see, sir.  And it say number 6, so now I can't read

1    and then got to go to must be addressed in a

2    separate civil, because it say facts and claims.

3         Q    Okay.  I understand.  Okay.  Good.  So

4    we've established that you know how to read.  Now,

5    do you know how to write?  Did you write the words

6    that are on this sheet of paper?

7         A    I attached additional pages as necessary

8    to list cases.

9         Q    I've got you.  I understand what you're

10   doing.  So I'm going to ask you a yes or no

11   question.  And that means all you have to do is say

12   yes or no.

13        A    I'm not -- I'm not allowed to -- I see a

14   Mason -- a Mason tag on his thing right there so I'm

15   not --

16        Q    I do not have a Mason's tag on.  This

17   is -- here, I'll just show it to you.  This is a

18   lapel pin.  It's from the Office of the Attorney

19   General, okay.

20        A    That's Mason right there?

21        Q    No, no, the Office of the Attorney General

22   is not Masons.  Like I showed you when we started

23   this, this is my, ID badge.  I'm from the Office of

24   the Attorney General.  This a lapel pen from the

25   Office of the Attorney General?

1    A    See, I can't -- I can't -- that's when the

2    classification told me if I ever see that in -- when

3    I went -- see, that's why I'm going off this must be

4    addressed in a separate civil rights complaint.

5    Q    Right.  I'll following with you.

6    A    Yeah, see right here fear full of officers

7    causing mental anguish.

8    Q    Good.  Good.

9    A    See, see, that's what I'm saying like,

10   every time I state something, see, this is mine

11   right here, this is the only thing I stated in here.

12   Every time I try to state something, you know,

13   Congress will tell me to state something, the

14   President will tell me to state something, family

15   members will tell me.  See, that's what I'm saying,

16   fear full of officers.

17   Q    Okay.  I understand you.  Good.  We know

18   that you can read now, good.

19   A    So now I've got to go back to here, must

20   be addressed in a separate civil right complaint.

21   Q    Perfect.

22   A    I ain't going to say nothing no more.

23   Q    Perfect.  Now, my question is, and it's a

24   yes or no question is:  Did you write the words on

25   this sheet of paper?  Did you take a pen or a pencil

1    and write these words?

2         A    Uhhh --

3         Q    It's just a yes or no question.

4         A    Well, it say due to the head injuries,

5    meaning due to the head injuries due to the warden,

6    that's what I get out of it.  It says due to the

7    head injuries --

8         Q    That's not my question.  That's -- it's a

9    yes or no question.  Did you write the words on this

10   sheet of paper?  I'm not trying to trick you.  I

11   just need you to answer, you know, to the best of

12   your abilities under your obligation to tell the

13   truth.

14        A    Plaintiff is -- is I'm allowed to speak

15   Spanish in America, like straight Spanish?

16        Q    If there's something you want to speak, at

17   some point, we'll allow time for that.

18        A    Okay.

19        Q    I just need you to answer a simple yes or

20   no question.  And the question is:  Did you write

21   the words on this sheet of paper?

22        A    No, sir.

23        Q    Okay.

24        A    You can't -- you can't write on a sheet of

25   paper.  This is nocation of filed of an 01/02/13/

1    document 23.

2         Q    Okay.  So you did not write the words on

3    this sheet of paper?  We're going to pause briefly.

4                        (WHEREUPON, an off-the-record

5                        discussion was held, after which

6                        the deposition continued.)

7         Q    (By Mr. Neiberger) We're back on the

8    record.  I believe the last question I asked you and

9    then you answered it negatively, you did not write

10   the words on this complaint; is that correct?

11        A    No.

12        Q    Okay.  Who wrote this complaint for you;

13   do you remember?

14        A    (No response.)

15        Q    It's been about sixty seconds.  I'm going

16   to restate my question to make sure you understand.

17   Who is the individual who wrote this complaint for

18   you?

19        A    Ivy so he could nutrients.

20        Q    Okay.  My question is:  Who wrote the

21   words on this sheet of paper?  Do you know who did?

22        A    You say only read the lines from --

23        Q    We're past that now.  I'm going to show

24   you document 23, page 7.  Is this your signature on

25   document 23, page 7?  It's in two places.

1       A    VI, statements of claims.  That's all I

2  can read because you said that's all I'm allowed to

3  read, don't go --

4       Q    Right.  That does say that's, actually

5  Roman Numeral VI, statement of claims, but my

6  question is:  Is did you sign your name in these two

7  places here at the bottom of page 7, is that your

8  name, Benjamin Washington, Benjamin Washington?  I

9  think it's probably been more than sixty seconds

10  now.  So my question is:  Did you sign your name at

11  the bottom of page 7 on document 23 right here?

12       A    I don't understand.  It's say true and

13  correct --

14       Q    Okay.  There's not much to understand,

15  okay.  There's a line at the bottom of page 7 and it

16  says signature of plaintiff.  And then there's

17  another line at the bottom of page 7 and it says

18  signature of plaintiff.  And my question is:  Did

19  you sign your name, Benjamin Washington, on these

20  two lines?  It's a yes or no question.

21       A    I never signed -- I can't sign my name on

22  the lines if that's printed --

23       Q    Okay.

24       A    -- in cursive.

25       Q    That's all I need to know is that you

1   didn't sign your name.  That's fine, okay.  My

2   question then, to the extent that you're able to

3   answer it is:  Who drafted this complaint for you?

4       A    I don't know.

5       Q    If you don't know, you don't know?

6       A    You're the one who brought it here.

7       Q    That's correct.  I did bring it here.

8       A    I thought that was my stuff you was

9   supposed it give me right there.

10      Q    No.  We can talk about -- well, we

11  probably won't get to it.  What this stuff that I

12  brought with me, it's all a DOC record or public

13  record.

14      A    What was the stuff I signed that I sent up

15  here --

16      Q    You haven't signed anything for me yet, to

17  my knowledge.

18      A    You told me that on the phone, when I

19  talked to you on the phone.  Who did I talk to on

20  the phone?  Your name is Calese Daniels; right?

21      Q    No.  Again, so my name is Eric Neiberger.

22      A    That's say in Spanish.  You told me I can

23  read in Spanish, right?  That's say Eric --

24      Q    There's nothing Spanish about this.

25  That's okay though.  It's a just standard American

1   English, to my knowledge.

2       A    And that's why I said is we allowed to

3   speak that, so he just spoke Spanish.  In America

4   that's -- that's Spanish.  And if Spanish people

5   want us to know that on TV, because you've got that

6   on TV.  So you're going to have to cut that off

7   because ICT wouldn't end up saying that I went

8   against the Constitution of Legal Rights because

9   that document is located inside the bowel of Jewish

10  rights.

11      Q    Okay.  Let me just tell me if you agree

12  with this statement.

13      A    See, that's another one.  I can't -- I'm

14  not going to be able to be here because I would

15  rather go wherever you send me at because I can't

16  even talk no more because if I talk anymore, that's

17  going against America.

18      Q    Okay.  Tell me if you agree with this

19  statement.  Somebody filed the complaint for you

20  using your name, yes or no?

21      A    See, now I can talk because he said tell

22  me the complaint.  That's Spanish again.  So he said

23  don't talk in the beginning, he said -- he said in

24  the beginning of statement 45, he said, I can talk

25  when he speaks Spanish.  So Spanish is the quote,

1    that's Jelovian -- that's not located in our system

2    yet.  So I'm in the border case of V Chapter 5,

3    which he had me state under the line, which I stated

4    under the line at first so.

5         Q    One more time.  Yes or no, somebody filed

6    this complaint for you, using your name?

7         A    No, sir.  I don't know anything about that

8    one.  That's snitching to me so I don't know --

9              COURT REPORTER:  That's what?

10        A    (By the Witness)  Snitching.  Like trying

11   to tell on the government, trying to tell on the

12   institution, trying to tell on the warden.  I'm not

13   suing the institution or the warden.  I was getting

14   something.  When I said I was with the government

15   and the warden, I was saying I was with them.  I was

16   working for them.  They was having me do something

17   to go undercover and do something, to come to prison

18   and do something, to lockdown one that was trying to

19   trespass and poison the institution.  So what I had

20   to do is what they said, which I couldn't state, but

21   now I can state now was, I had got poisoned located

22   was approved by the government.  And let me state

23   over, normal pronunciation, the president.  I have

24   talked to the president on the phone.  He has told

25   me, at this point --

1      Q     (By Mr. Neiberger) Let's hold on a second.
2    I'm going to ask you one final time?
3      A     Yes.
4      Q     Yes or no, somebody filed this complaint
5    for you using your name, and I'll put it back in
6    front of you?
7      A     I don't see nothing.
8      Q     Okay.  So you don't even recognize the
9    complaint?
10     A     I see this file 01/02 then I've got to ask
11   you can I speak right here.
12     Q     Tell me what you know.
13     A     Okay.  I see the Constitution has produced
14   a vile -- a virus on accident.  It was caused by
15   diarrhea, them saying --
16     Q     Okay.  Okay.  I don't think you drafted
17   this.  You may or may not understand my questions.
18   That's fine.  I believe I heard you mention
19   something, probably half an hour ago now, about a
20   tooth, but you said it was your fault.  Did you lose
21   a tooth, at some point?
22     A     Huh?
23     Q     Have you lost a tooth while you were
24   incarcerated in the Department of Corrections?  May
25   I ask what you're looking at?  Are you looking at my

1    highlighter?

2       A     What I did was put CB-4 in here so I could

3    clean out the air.

4             COURT REPORTER:  You put what?

5       A     (By the Witness)  CV-4.

6       Q     (By Mr. Neiberger) Okay.

7       A     So the CB-4 -- see, CB-4, see before look.

8       Q     Let's not get sidetracked here, okay.

9    About a half an hour ago you said you lost a tooth?

10      A     Yeah.

11      Q     Is that correct?

12      A     Oh, I didn't lose it.  See, my teeth don't

13   lose.  It's just like if I pass away, okay, I pass

14   away, but it takes just a long time to always come

15   back, do you know what I'm saying.  It's like if I

16   lose a tooth, it takes one -- I'm just under

17   jurisdiction right now.  It's like when I pass away,

18   like we all pass away, it takes certain people to

19   bring us back.  Like it takes certain family members

20   to bring us back.  What we have done is, when one

21   family member is missing, which everybody know, I've

22   been missing and, do you know what I'm saying,

23   that's the only thing was wrong, but I haven't been

24   gone that long.  I've only been gone in this time

25   frame, 45 minutes.

1      Q      Stop.  My question is:  At some point

2   while you were incarcerated in the Department of

3   Corrections, did you lose a tooth, yes or no?

4      A      I lost a tooth but --

5      Q      So you did lose a tooth; correct?

6      A      I ain't going to say I lost a tooth.

7   That's snitching.

8      Q      Okay.

9      A      I'm under the law, if you snitch, you

10   violate the prophesy of genesis, but it's spelled Q

11   -- it ain't no Q -- but it's got to be under a

12   bennis square.  A bennis square is like --

13            COURT REPORTER:  A what?

14            THE WITNESS:  A bennis?

15            COURT REPORTER:  Bennis?

16            THE WITNESS:  (Nods head.)

17      Q      (By Mr. Neiberger) Okay.  You will not

18   tell me whether or not you lost a tooth, that's

19   fine.  I believe you also said that when you lost a

20   tooth it was your fault; is that correct?

21      A      If I don't -- what is this -- is this like

22   I'm getting something or is I'm crossing like the

23   government or this is the way to get --

24      Q      No, no.

25      A      What is there trying to find out what this

1    suit, this lawsuit like?

2         Q    You have filed this suit.  You might not

3    have realized it, but either you or somebody you

4    know is prosecuting a lawsuit in your name.  You

5    might not even know them, actually.  My question is:

6    You stated about half an hour ago that you lost a

7    tooth and that it was your fault; is that correct?

8         A    What do you want me state again, through

9    the medication I'm taking through the --

10        Q    Hold on.  Hold on.  We'll talk about

11   medication in a minute because I think you told me

12   you weren't taking any.  My question is:  Did you

13   previously state that you had lost a tooth and that

14   it was not your fault or, excuse me, and that it was

15   your fault?

16        A    Yes, I'm missing a tooth.  They said they

17   was going to fix it at the hospital.  They said they

18   were the only one who could do surgery on the teeth.

19   My gums was knocked out from the root.  I was

20   supposed to go to the hospital and, also, they was

21   going to hook me up with some teeth, they say --

22   they saved my life and stuff like that, the hospital

23   did.

24        Q    Okay.  Good.

25        A    That's --

1   Q   That's perfect.  So you lost a tooth.

2   A   Uh-huh.

3   Q   We're on the same page now.  Was it your

4   fault that you lost the tooth?

5   A   Yes.  Yes, yes, it was.  Yes, it was.

6   Q   Okay.  Perfect.  Thank you.  Do you

7   remember an officer named Hall?

8   A   Yes, I do remember an officer named K.

9   Hall, but his name is not -- his name is Kale Hall.

10  You say Kyle, like Kyle Bush.  His name is Kale

11  Hall, Earn Bush.

12  Q   Can you spell Kale for me?

13  A   Yeah C -- let me correct it.  Wrong

14  pronunciation under a verman attitude.  I'm studying

15  the art of Christian.  So that was the wrong

16  pronunciation.  So you'll want to scratch that out

17  and if you want me to spell is it with a C, I will

18  have to change it to a C-Q-V-L-E-Y-E-T-L-E, but he

19  don't spell it, but he might want that.  So he's

20  spelling it K, but it's coming out K, so I'm going

21  to K-A-L-T-O-V-L-E, which is K-Y-L-E.

22  Q   Okay.  Can you -- how tall is Officer

23  Hall?

24  A   He's not a height.  That will be judging

25  him as an officer with the ICT.

1       Q    Let me just ask the question again:  How

2    tall is Officer Hall?

3       A    Can I say it in weight, because he's in

4    weight?

5       Q    Okay.  Well, my second question is going

6    to be:  How much does Officer Hall weigh?  My first

7    question is:  Is how tall is Officer Hall?  I mean,

8    if you don't understand exactly how tall he is, you

9    can just say, you know, he is -- give me a rough

10   estimate.  Do you know what an estimate is?  How

11   many feet tall is Officer Hall?

12      A    Can I state a levense comment,

13   L-L-T-T-V-V-L-E-E-E-V-V-L-E-T-T-L-E-L-E-V-V-V

14   tenology.

15      Q    Okay.  Let me try asking you a question

16   this way:  Describe Officer Hall to me, as best as

17   you can?

18      A    Chocolate.

19      Q    Okay.  He's a black guy?

20      A    No, chocolate mean a describable color.

21   That means he's not white, he's not Caucasian, he's

22   in thalmoqual.

23           COURT REPORTER:  In where?

24           THE WITNESS:  In thalmoqual.  I learned it

25           from Malcolm X elementary.

1        Q      (By Mr. Neiberger) Let me ask the question

2    this way:  Can you tell me anything about Officer

3    Hall's physical characteristics?  Is he tall, is he

4    short, is he white, is he black, is he heavyset, is

5    he thin?  I'm going to give you about 45 seconds to

6    think about it.

7        A      You say five minutes to think about it?

8        Q      Now, just take as much time as you

9    reasonably need.  Try to describe Officer Hall to

10   me.

11       A      What is your five minutes like, five

12   minutes in regular time in America or five minutes

13   -- if not five minutes is, that's 11 years and 68

14   days and 2.3 seconds, that's, to me, five minutes,

15   that's a lot of time.  That's too much time.  That's

16   only like kill.  That's three billion years in --

17       Q      Let me ask the question this way:  Would

18   you be able -- would you recognize Officer Hall if

19   you saw him?

20       A      Yes, sir.  The person that --

21       Q      How would you be able to recognize Officer

22   Hall?

23       A      To go to the hospital to see him at the

24   hospital, to go to the hospital and get my teeth

25   fixed like I was supposed to go, but I'm not allowed

1   to say that like that.  That came out wrong.

2       Q    That's okay.  There's not really wrong

3   answers I think that you can give me.  Let's go off

4   the record for just a moment.

5                        (WHEREUPON, an off-the-record

6                        discussion was held, after which

7                        the deposition continued.)

8       Q    (By Mr. Neiberger) I just want to ask you

9   one more question.  How did you lose your tooth?

10      A    How I lost my tooth -- I lost my tooth by

11  getting kicked in the mouth.  Not only getting

12  kicked in the mouth with a twist, spit on and

13  stomped, lose conscious, pulled out the staple, cut

14  on the microwave and hold your head still while one

15  plugged the unit in, okay.  When one plugged the

16  units in, they snatched out the umbilical cord

17  inside the wound.  What caused the fraction to rip

18  out all your family's intercourse, and all the

19  little kid's intercourse in the world.  So I had to

20  give in.  So by me giving in, he hit my chip.  When

21  it hit the chip, it pulled out the nozzle, which

22  trapped the hands inside the time of the frame.

23  Okay.  When I pulled it out, that's why the hands

24  let it be in, because they wanted to know who the

25  one that took that much of a death to qualify to let

1    you -- let maw out to the zip chord.  That's how maw

2    got released and got sent to quarterdale.  Okay.

3    Once it got sent to quarterdale, that's the velouse.

4              COURT REPORTER:  That's the what?

5        A    (By the Witness)  The velouse.  The

6    velouse.  It's a T-E-R-R vor contonour.  It's the

7    intercourse to stop one from hitting the missile.

8    So it's like you've got to give birth.  All this

9    stuff we were doing from the beginning time is birth

10   to keep one and to violate one from not passing, but

11   to qualify one until they own communalization.  It's

12   like you've got see one.  You can't victimize one

13   and eternal one forever, but one is going to see

14   that there is a hell, there is a heaven, there is

15   zermatuse calourts.  Do you see what I'm saying?

16       Q    (By Mr. Neiberger) Okay.  I've got your

17   answer.  That's good.  Thank you very much.

18                  Actually, I do have one more

19   question.  What is all this white stuff on your face

20   or on your head?

21       A    Okay.

22       Q    Do you know what it is?

23       A    Okay.  That was curing -- it was curing

24   intertubes.

25       Q    Okay.  That's fine.  As long as you're

1    aware of it, that's fine.  You, also, I think you

2    have a leaf or it looks like a leaf on your head.  I

3    don't know if that's there or purpose or not, but

4    this is on video so I just want to make sure we

5    address it.  At this time it is 12:25.  I think

6    we're going to conclude the deposition for the

7    moment.

8        A    So don't come back?  Five minutes is over

9    with?

10       Q    Hold on.  Let me finish.  We're going to

11    conclude the deposition for today.  It is entirely

12    possible that we're going to have to could back and

13    do this again.  I think we're allowed seven hours

14    worth of ruled.  I think we've used about an hour

15    and a half.  So this deposition is not over, it's

16    just being concluded for today.  I mean, if we have

17    to seek relief from the court to do it again, I

18    guess we will, but just be aware that this

19    deposition is not over, we're just pausing for today

20    to kind of get our bearings, okay?

21       A    So when do I come back?

22       Q    I don't know yet because I haven't figured

23    that out, obviously.  What will happen now is you'll

24    have the opportunity to do what's called a read or

25    waive.  So, as you know, there's a stenographer here

1   who's been typing down everything you said.  When I

2   purchase that transcript from her, I'm going to get

3   you on call out so you can go through the deposition

4   transcript and make sure it's all correct.  So now

5   you can waive doing that, if you want but my

6   suspicion is that it's probably best for to you

7   read.  So -- I don't have any other questions for

8   you, at this time.  Again, we may have to do this

9   again, but we'll see.  And we're going to call it a

10  day.  Does sound like a plan to you?

11       A    It's up to you.  If you call it a day

12  means don't come back up, do I still get to eat and

13  stuff like you just said?

14       Q    Yes.  You'll still get to eat.  I'm not

15  saying you're not going to come back.  I'm saying

16  we're done for today and we're going to temporarily

17  conclude this deposition.

18       A    You said I get medication to, for now on

19  you said do I understand the way you were speaking.

20  You said I get medication, you said now I get bag

21  lunches, I get canteen, free canteen, that what you

22  said.

23       Q    No, no, no, I haven't said any of those.

24       A    You didn't?

25       Q    You will get a lunch.  You will get

1    dinner.  DOC is required to feed you.

2         A    You say it --

3         Q    I can't give you free canteen.  Well, I

4    can't get free canteen myself, to my knowledge?

5         A    So I don't get to go home?

6         Q    I'm not the person that's involved with

7    your criminal case.  It appears to me that you've

8    got a criminal case going on.  That's totally

9    separate from this?

10        A    That's saying I get to go home right

11   there, ain't it, V-L-T-T-L-E-L-E-S-S-E.

12        Q    Well -- and I wish you best of luck

13   getting out of the place.

14        A    I speak in Spanish.  You said I couldn't

15   speak Spanish but now he's saying I can speak

16   Spanish again.

17        Q    Okay.

18        A    He's saying don't get no where, that's all

19   you said, five minutes, that means every time I say

20   something and you catch me, I get more time.

21        Q    Okay.  Mr. Washington, I'm going to go

22   ahead and let the correction's officer know that

23   we've finished.

24        A    See, I'm done now.

25        Q    We may or may not be back here again.  So

1    just be aware of that in the back of your head, that

2    we may do this again.  All right.  I'm going to go

3    let the correction officer know.  And I'm going to

4    go ahead and just set up to read and go through the

5    transcript because that seems best.  We're finished,

6    sir.  We're all done.

7                    (WHEREUPON:  The deposition was

8    concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **E R R A T A   S H E E T**

3   :WITNESS

4   BENJAMIN WASHINGTON

5            I hereby certify that I have read the

6   attached pages, numbered 1 through 44 inclusive; and

7   the testimony contained therein is TRUE and CORRECT

8   except for the changes shown below, if any:

9   PAGE NO.    LINE NO.      CORRECTIONS/COMMENTS

10

11

12

13

14

15

16

17

18

19

20                                  _____

21                                  BENJAMIN WASHINGTON

22

23   SWORN AND SUBSCRIBED before me this the _____ day
     of April, 2015
24

25                                  _____
                                    NOTARY PUBLIC, STATE OF FLORIDA

1          MY COMMISSION EXPIRES:

2

3              **CERTIFICATE OF OATH**

4

5     STATE OF FLORIDA

6     COUNTY OF ESCAMBIA

7

8     I, the undersigned authority, certify that BENJAMIN

9          WASHINGTON personally appeared before me and

10         was duly sworn.

11

12    WITNESS my hand and official seal this 17th day of

13         April, 2015.

14

15

16                    _____

17                    ELAINE RICHBOURG

18

19

20

21

22

23

24

25

1

2               **REPORTER'S DEPOSITION CERTIFICATE**

3

4   I, ELAINE RICHBOURG, Court Reporter, certify that I
        was authorized to and did stenographically
5       report the foregoing deposition of BENJAMIN
        WASHINGTON; and that a review of the transcript
6       was requested; and that the transcript is a
        true and complete record of my stenographic
7       notes.

8   I further certify that I am not a relative,
        employee, attorney, or counsel of any of the
9       parties, attorney or counsel connected with the
        action, nor am I financially interested in the
10      action.

11

12      Dated this 17th day of April, 2015.

13

14      _____

15          ELAINE RICHBOURG, COURT REPORTER

16

17

18

19

20

21

22

23

24

25